## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JOHN GEORGE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO:** |
| **v.** | ) | _____ |
| | ) | |
| **EQUIFAX INFORMATION** | ) | |
| **SERVICES LLC, and CREDIT** | ) | **JURY TRIAL DEMANDED** |
| **FIRST NATIONAL ASSOCIATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

PLAINTIFF JOHN GEORGE files this Complaint and states as follows:

1.      For many months, Mr. George has been applying for credit so that he could pay for some major life events, including his daughter's wedding.

2.      For much of that time, Equifax Information Services LLC and Credit First National Association have been preventing Mr. George from obtaining this credit because they were reporting him as "deceased" on his credit reports.

3.      Mr. George is not deceased.

4.      By reporting Plaintiff as "deceased," Defendants have made it nearly impossible for him to access loans or other credit because "deceased" consumers have no credit scores.

5. What's worse is that even after Plaintiff notified Equifax and Credit First of this error, and the error had been removed from Plaintiff's Equifax credit report several times, Defendants repeatedly reinserted the inaccurate "deceased" notation on his credit reports.

6. Mr. George brings this action against Defendants for multiple violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA").

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) as Equifax regularly conducts business in this district and division and a substantial part of the events giving rise to the claims occurred in this district and division.

9. Equifax has contracted to supply services or things in Georgia. It sells consumer reports in Georgia and produces consumer reports on Georgia residents. It also gathers and maintains substantial public records data from Georgia.

## PARTIES

10. Mr. George is a resident of Texas. He is a natural person and a "consumer" as protected and governed by the FCRA, 15 U.S.C. § 1681a(c).

11.     Equifax is a consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f), and it has a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309-2402.

12.     Credit First is a person who furnishes information to consumer reporting agencies under the FCRA, 15 U.S.C. § 1681s-2[1], and conducts substantial and regular business activities in this judicial district.

13.     Credit First has a principal place of business located at 6275 Eastland Road, Brook Park, OH 44142.

## FACTUAL ALLEGATIONS

### Defendants' Practices

14.     The FCRA requires that when a CRA prepares a credit report, it must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

15.     As part of the requirement to follow reasonable procedures to assure maximum possible accuracy, the Federal Trade Commission has instructed that CRAs must maintain procedures to avoid reporting information with "obvious logical inconsistencies."  *40 Years of Experience with the Fair Credit Reporting*

---

[1] Plaintiff is making a claim against Credit First under Section 1681s-2(b).  Plaintiff is not making a claim against Credit First under Section 1681s-2(a).

*Act: An FTC Staff Report with Summary of Interpretations*, Federal Trade Commission, 2011 WL 3020575, at *61 (2011).

16.    This includes, for example, a requirement that CRAs should establish procedures to avoid reporting information from its furnishers that appears "implausible or inconsistent." *Id.*

17.    One of the most harmful types of credit reporting inaccuracies occurs where CRAs report that a living consumer is deceased.

18.    Equifax places a "deceased" notation on consumers' reports when it is advised from any of its many data furnishing sources that a consumer is deceased.

19.    The furnishing sources identify "deceased" consumers by marking the status of such consumer's responsibility for any subject account with an "X" code in the ECOA field of an electronic data input format used in the credit reporting industry, known as Metro 2.

20.    Equifax does not request or require a death certificate from any of its data sources that advise that a consumer is "deceased" before placing a "deceased" mark on that consumer's report.

21.    Equifax does not request or require any proof from any data source that advises that a consumer is "deceased" showing that the consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

22.     Equifax does not independently verify with any source that a consumer is, in fact, deceased before placing a "deceased" mark on that consumer's report.

23.     Equifax recognizes that the "deceased" notification is a very unusual note on a credit file.  This is especially true where other creditors are not reporting the consumer as deceased, and instead are reporting that the consumer is actively participating in the credit markets.

24.     In some cases, Equifax, to assure accuracy, sends letters and/or other communications to consumers when suspicious or unreliable information is furnished about such consumers to be placed in their credit files, such as when consumers have a freeze or fraud alert on their report, or in accordance with certain state laws.

25.     Equifax has no similar procedure to notify consumers (or next of kin or executors or administrators of the consumer's estate) when an "X" deceased code is furnished to Equifax by a furnisher to be placed in the consumer's credit file.

26.     Equifax regularly receives the "Death Master File" from the Social Security Administration listing by social security number those consumers that the government believes to be deceased.

27.     Equifax does not cross-reference the "X" code received from furnishers with the Death Master File in order to determine whether any given

consumer reported as deceased by a furnisher is also on the Death Master File before selling a credit report about such consumer, or at any time.

28.     Equifax only uses the Death Master File to sell additional products for an additional fee, which are designed to show whether a given consumer is truly deceased.

29.     Equifax does not apply any procedures whatsoever to assure that a consumer with a "deceased" mark on his/her report as a result of a furnisher reporting an "X" code is, in fact, deceased before placing the "deceased" mark on that consumer's report and selling that report.

30.     Equifax does not apply any procedures whatsoever to reconcile obvious illogical and inconsistent information where one data furnisher reports a consumer as deceased, but the consumer's other creditors report open and active account activity.

31.     In other words, even where other data on the face of the consumer's report indicates that he/she is not deceased, Equifax does not apply any procedures that assure a consumer with a "deceased" mark on his/her credit report is, in fact, deceased before placing the "deceased" status on that consumer's file.

32.     Even when the purportedly deceased consumer communicates directly with Equifax, Equifax still applies no procedures to assure that the consumer with

a "deceased" mark on his/her report is, in fact, deceased before placing the "deceased" status on that consumer's file.

33.     Even consumers who dispute the erroneous "deceased" status on their Equifax credit reports continue to be erroneously marked as deceased unless the furnishing source which provided the erroneous "X" code in the first instance decides to change the code.

34.     Equifax has no independent procedure to change an erroneous deceased status on its own and will merely parrot their furnishing source in the case of a reinvestigation into the accuracy of the deceased status upon a consumer's report.

35.     Equifax warns the relatives of truly deceased consumers that identity theft can be committed using the credit reports and information of the deceased, and requires relatives to provide a death certificate or executorship papers, or other proofs of death, before accessing the deceased consumer's credit information or report.

36.     Equifax has no similar death certificate, executorship paper, or any other proof requirement for their data sources which report a consumer as deceased.

37.     Once a "deceased" mark is placed on a consumer's file, Equifax will not calculate and will not provide a credit score for that consumer.  Essentially, the "deceased" status code entirely shuts down a consumer's credit file.

38.     Equifax knows that its procedures, or lack thereof, are causing inaccurate credit reports that report living consumers as deceased.

39.     Equifax knows that living consumers are turned down for credit specifically because it reports them as "deceased."

40.     Equifax has long been on notice that its procedures for ensuring the maximum possible accuracy of the "deceased" status code are inadequate.

41.     For more than a decade Equifax has faced numerous lawsuits due to it falsely reporting that consumers are deceased.

42.     In 2015, Equifax entered into a settlement with a multistate group of Attorneys General where it agreed to develop best practices for identifying and preventing inaccurate reporting when a consumer disputes a report stating that he/she is deceased.

43.     Despite this settlement agreement, Equifax continues to repeatedly falsely label living consumers as deceased.

44.     Equifax has received thousands of disputes from consumers who dispute that Equifax falsely labeled them as deceased.

45.     Despite federal law, FTC guidance, government enforcement actions, numerous lawsuits, and thousands of consumer disputes, Equifax continues to falsely label consumers as deceased, including Plaintiff.

46.     When CRAs report inaccurate or incomplete information about consumers, the consumers have the right under the FCRA to submit disputes to the CRAs.

47.     Upon receipt of the dispute, the FCRA requires that the CRA conduct a reasonable reinvestigation of any information that is disputed by a consumer to determine if the information is accurate.  The CRA must notify the source of the disputed information about the consumer's dispute. The CRA must provide the source with all relevant information received from the consumer.  The CRA must review and consider all relevant information provided by the consumer in conducting the reinvestigation.  If information cannot be verified as accurate, the CRA "shall . . . promptly delete that item of information from the file of the consumer[.]" 15 U.S.C. § 1681i(a)(5)(i).   The CRA must complete the reinvestigation within 30 days, or within 45 days if the dispute is based on a free annual credit report.  The CRA must send the consumer written results of the reinvestigation and a credit report that is based on the consumer's file as that file is revised as a result of the reinvestigation.  15 U.S.C. § 1681i(a).

48.     The FCRA also requires that CRAs have reasonable procedures to prevent the reappearance of previously deleted information in a consumer's file.  15 U.S.C. § 1681i(a)(5)(C).  It also provides for specific actions that a CRA must take if it seeks to reinsert previously deleted information in a consumer's file.  15 U.S.C.

§ 1681i(a)(5)(B).  Previously deleted information can only be reinserted in a file if the CRA first receives a certification from the furnisher of information that the information is complete and accurate.  And the CRA must notify the consumer in writing of the reinsertion no later than five business days after the CRA reinserts the previously deleted information.  15 U.S.C. § 1681i(a)(5)(B).

49.     The FCRA also imposes duties on persons who furnish information to CRAs.  15 U.S.C. §§ 1681s-2(a), (2), (4), (5).  Specifically, these persons, called "furnishers," must take certain actions after receipt of notice of a consumer dispute from a CRA, including correcting inaccurate information that it has supplied to a CRA and permanently blocking the information from reappearing.  15 U.S.C. §§ 1681s-2(b)(1)(A-E).

50.     Section 1681s-2(b) of the FCRA establishes a mechanism for consumers to dispute the accuracy or completeness of information that furnishers provide to CRAs.  After a consumer has submitted a dispute to a CRA, the CRA must notify the furnisher of the disputed information.  15 U.S.C. § 1681i(a)(2).  The CRA must provide this notice of dispute within five days of receipt of the dispute and must include "all relevant information" provided by the consumer.  15 U.S.C. § 1681i(a)(2)(B).

51.     Once a furnisher receives notice of a dispute from a CRA, Section 1681s-2(b) requires that the furnisher "shall" (1) conduct an investigation with

respect to the disputed information; (2) review all relevant information provided by the CRA in connection with the dispute; and (3) report the results of the investigation to the CRA. 15 U.S.C. §§ 1681s-2(b)(1)(A)-(C).

52.     Should the investigation determine that the disputed information is inaccurate, incomplete, or cannot be verified, the furnisher must modify, delete, or permanently block the reporting of that information to CRAs, as appropriate based on the results of the reinvestigation.  15 U.S.C. § 1681s-2(b)(1)(E).

### Plaintiff's Experience

53.     Since at least December 2020, Equifax has been furnishing consumer reports to third parties that report Plaintiff as "deceased."

54.     Plaintiff is not deceased.

55.     This inaccurate "deceased" status was the result of one creditor, Credit First, erroneously reporting Plaintiff as deceased with an "X" status code.

56.     Plaintiff's other creditors did not report him as deceased to Equifax.

57.     To the contrary, Plaintiff's other creditors reported that he was actively paying and using his credit accounts.

58.     When he learned of the erroneous reporting, Plaintiff disputed the erroneous deceased status with Equifax on December 23, 2020.

59.     Equifax received Plaintiff's dispute.

60.     Equifax never responded to Plaintiff's dispute.

61.     When he received no response from Equifax, Plaintiff submitted a second dispute to Equifax on January 21, 2021.

62.     Equifax received Plaintiff's dispute and, upon information and belief, conducted an investigation.

63.     Upon information and belief, as part of its investigation Equifax notified Credit First that Plaintiff was disputing that he is not deceased.

64.     Upon information and belief, Credit First conducted its investigation of Plaintiff's dispute and determined that the "deceased" notation was inaccurate.

65.     Upon information and belief, Credit First notified Equifax that the "deceased" notation was inaccurate and should be deleted.

66.     Equifax did not, however, provide Plaintiff with the results of its reinvestigation of his dispute.

67.     On January 21, 2021, Plaintiff applied for credit cards with First Digital Card through Synovus Bank, as well as Total Visa through the Bank of Missouri.

68.     First Digital Card sent Plaintiff a denial letter stating that it was unable to approve his credit application because it was unable to obtain his credit score.

69.     Total Visa sent Plaintiff a denial letter stating that it was unable to approve his credit application because it was unable to obtain his credit score.

70.    On January 23, 2021, Plaintiff applied for a credit card with David's Bridal through Comenity Bank.

71.    On January 24, 2021, Comenity Bank sent Plaintiff a denial letter stating that it was unable to approve his credit application because "the credit reporting agency has indicated the applicant is deceased."

72.    On January 25, 2021, Plaintiff made multiple phone calls to Credit First to dispute the erroneous "deceased" status it was reporting to Equifax.

73.    On or about January 25, 2021, Plaintiff obtained a copy of his Equifax consumer report and discovered that the "deceased" notation had been removed.

74.    But on January 29, 2021, Plaintiff received an email from Equifax stating that the "deceased" notation had been reinserted in his Equifax consumer report.

75.    Equifax did not provide Plaintiff with a written notice that the disputed and deleted information had been reinserted into his file.

76.    Equifax did not provide Plaintiff with a written notice that he had a right to add a statement to his consumer file disputing the accuracy or completeness of the disputed information that had been reinserted.

77.    Prior to reinserting the disputed information into Plaintiff's file, Equifax did not obtain a certification from the source of the information that it was accurate.

78.     On February 25, 2021, Plaintiff sent yet another dispute letter to Equifax.

79.     In the dispute letter, Plaintiff provided Equifax with information about the erroneous "deceased" notation, including a timeline of his prior communications and disputes with Equifax.

80.     Equifax received Mr. George's dispute and conducted a reinvestigation.

81.     As part of its reinvestigation, Equifax contacted Credit First and provided it with information about Mr. George's dispute.

82.     Credit First conducted its reinvestigation and determined that the "deceased" notation was inaccurate.

83.     Credit First notified Equifax that the "deceased" notation was inaccurate and should be deleted.

84.     On March 2, 2021, Equifax notified Mr. George of the results of its reinvestigation.  It explained that "[t]his account/item has been updated to no longer report as deceased."

85.     That same day, Plaintiff received a denial letter from Capital One Bank stating that it could not approve his credit application because "[b]ased on your credit report from one or more of the agencies below, submitter is reported as deceased."

86.   On March 30, 2021, Plaintiff received notification that Equifax had reinserted the "deceased" in his Equifax consumer report again.

87.   Equifax did not provide Plaintiff with a written notice that the disputed and deleted information had been reinserted into his file.

88.   Equifax did not provide Plaintiff with a written notice that he had a right to add a statement to his consumer file disputing the accuracy or completeness of the disputed information that had been reinserted.

89.   Prior to reinserting the disputed information into Plaintiff's file, Equifax again did not obtain a certification from the source of the information that it was accurate.

90.   As a result of Defendants' repeated failures to comply with the requirements of the FCRA, Plaintiff has suffered and continues to suffer actual damages, including economic loss, lost opportunity to receive credit, damage to reputation, reduction in credit score, invasion of privacy, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

## FIRST CLAIM FOR RELIEF

### (Against Equifax)

### (15 U.S.C. § 1681e(b))

91.     Plaintiff realleges Paragraph Nos. 1-90 as if fully set forth herein.

92.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports furnished regarding Plaintiff.

93.     Equifax furnished inaccurate reports about Plaintiff stating that he was deceased, when he was not deceased.

94.     Before issuing reports stating that Plaintiff was deceased, Equifax possessed information showing that he was not deceased.

95.     Before issuing reports stating that Plaintiff was deceased, Equifax could have taken reasonable steps to verify the accuracy of the "deceased" notation.

96.     Equifax knew or should have known about its obligations under the FCRA.  These obligations are well established in the plain language of the FCRA, in the promulgations of the Federal Trade Commission, and in well-established case law.

97.     Equifax obtained or had available substantial written materials that apprised it of its duties under the FCRA.

98.     Despite knowing of these legal obligations, Equifax acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

99.     As a result of these FCRA violations, Plaintiff has suffered, and continues to suffer, actual damages, lost opportunities to receive credit, economic

loss, damage to reputation, reduction in credit score, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

100.   The violations by Equifax were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

101.   Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. §1681o(a) or, alternatively, 15 U.S.C. 1681o(a).

## SECOND CLAIM FOR RELIEF

### (Against Equifax)

### (15 U.S.C. § 1681i(a))

102.   Plaintiff realleges Paragraph Nos. 1-90 as if fully set forth herein.

103.   Equifax violated 15 U.S.C. § 1681i by, among other things, failing to (1) "conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller," and (2) provide to Plaintiff the notices required under 15 U.S.C. § 1681i(a)(6).

104.   Equifax knew or should have known about its obligations under the FCRA.  These obligations are well established in the plain language of the FCRA, in the promulgations of the Federal Trade Commission, and in well-established case law.

105.   Equifax obtained or had available substantial written materials that apprised it of its duties under the FCRA.

106.   Despite knowing of these legal obligations, Equifax acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

107.   As a result of these FCRA violations, Plaintiff has suffered, and continues to suffer, actual damages, lost opportunities to receive credit, economic loss, damage to reputation, reduction in credit score, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

108.   The violations by Equifax were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

109.   Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. §1681o(a) or, alternatively, 15 U.S.C. 1681o(a).

**THIRD CLAIM FOR RELIEF**

**(Against Equifax)**

**(15 U.S.C. § 1681i(a)(5))**

110.   Plaintiff realleges Paragraph Nos. 1-90 as if fully set forth herein.

111.   Equifax violated 15 U.S.C. § 1681i(a)(5)(B) by failing to provide Plaintiff with a "(I) a statement that the disputed information has been reinserted; (II) the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and (III) a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information."

112.   Equifax further violated 15 U.S.C. § 1681i(a)(5)(C) by failing to "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i))."

113.   Equifax knew or should have known about its obligations under the FCRA.  These obligations are well established in the plain language of the FCRA, in the promulgations of the Federal Trade Commission, and in well-established case law.

114.   Equifax obtained or had available substantial written materials that apprised it of its duties under the FCRA.

115.   Despite knowing of these legal obligations, Equifax acted consciously in breaching its known duties and deprived Plaintiff of his rights under the FCRA.

116.   As a result of these FCRA violations, Plaintiff has suffered, and continues to suffer, actual damages, lost opportunities to receive credit, economic loss, damage to reputation, reduction in credit score, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

117.   The violations by Equifax were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Equifax was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

118.   Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. §1681o(a) or, alternatively, 15 U.S.C. 1681o(a).

### FOURTH CLAIM FOR RELIEF

### (Against Credit First)

### (15 U.S.C. § 1681s-2(b))

119.   Plaintiff realleges Paragraph Nos. 1-90 as if fully set forth herein.

120.   Mr. George made several requests to Equifax for deletion of the erroneous "deceased" notation on his credit report, and Equifax, upon information and belief, contacted Credit First regarding Plaintiff's disputes.

121.   Despite its knowledge of its erroneous reporting, Credit First failed to permanently block the reporting of the information it had found to be inaccurate.

122.   As a result of Credit First's failure to comply with 15 U.S.C. § 1681s-2(b)(1)(E), Plaintiff has suffered, and continues to suffer, actual damages, including credit denials, lost opportunity to receive credit, economic loss, damage to reputation, emotional distress, and interference with normal and usual activities for which Plaintiff seeks damages in an amount to be determined by the jury.

123.   The violations by Credit First were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Credit First was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

124.   Plaintiff is entitled to recover attorney fees pursuant to 15 U.S.C. § 1681o(a) or, alternatively, 15 U.S.C. § 1681o(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

    a. An award of actual, statutory and punitive damages for Plaintiff;

b.  An award of pre-judgment and post-judgment interest as provided by law;

c.  An award of attorneys' fees and costs; and

d.  Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

**PLAINTIFF hereby demands a jury trial on all claims for which he has a right to a jury.**

DATED: May 25, 2021

By: /s/ Andrew Weiner
Andrew L. Weiner
Georgia Bar No. 808278
Jeffrey B. Sand
Georgia Bar No. 181568
WEINER & SAND LLC
800 Battery Ave. SE
Suite 100
Atlanta, GA  30339
(404) 205-5029 (Tel.)
(404) 254-0842 (Tel.)
(866) 800-1482 (Fax)
aw@wsjustice.com
js@wsjustice.com

COUNSEL FOR PLAINTIFF